IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRYAN SUMNER,                        )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        CASE NO. 1:05-CV-1201-WKW
                                     )               [WO]
                                     )
SHERIFF LAMAR GLOVER, et al.,        )
                                     )
        Defendants.                  )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

In this 42 U.S.C. § 1983 action, Bryan Sumner ["Sumner"], a former inmate, challenges the constitutionality of actions taken against him during his incarceration at the Houston County Jail in November of 2005. Specifically, Sumner complains that a correctional officer used excessive force against him on November 14, 2005 and members of the jail's medical staff denied him adequate treatment for an eye injury allegedly suffered as a result of the officer's use of force. Sumner names Lamar Glover, the sheriff of Houston County, Alabama, Ellis Rodgers, an officer employed at the Houston County Jail, and nurses Darla Speigner, Valerie Hathaway and Laura Laguerra as defendants in this cause of action.[1] Sumner seeks declaratory, injunctive and monetary relief for the alleged

---

[1]Although the plaintiff identifies the last defendant nurse as Laura Lagaria, the defendants assert the proper name of this individual is Laura Laguerra. For purposes of this Recommendation, the court will refer to this defendant by her correct name.

violations of his constitutional rights.[2]

The defendants filed a special report and supporting evidentiary materials addressing Sumner's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to treat this report as a motion for summary judgment. *Order of April 24, 2006 - Court Doc. No. 26*. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of such motion, the evidentiary materials filed in support thereof, and the plaintiff's response in opposition to this motion, the court concludes that the defendants' motion for summary judgment is due to be granted in part and denied in part.

## I. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir.2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(c), as amended December 1, 2007, (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[2]In his complaint, Sumner requests declaratory and injunctive relief. Additionally, in response to the defendants' special report and answer, Sumner argues entitlement to monetary damages.

law.").[3]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendants have met their evidentiary burden.  Thus, the burden shifts to the plaintiff to establish, with evidence beyond the pleadings, that a genuine issue material to each of his claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial.").  A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

---

[3]Effective December 1, 2007, "[t]he language of Rule 56 [was] amended ... to make the rule[] more easily understood and to make style and terminology consistent throughout the rules.  These changes ... are stylistic only."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior rule remain equally applicable to the current rule.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of
professional judgment.  In respect to the latter, our inferences must accord
deference to the views of prison authorities.  Unless a prisoner can point to
sufficient evidence regarding such issues of judgment to allow him to prevail
on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, ---, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (citation

omitted).  Consequently, to survive the defendants' properly supported motion for summary

judgment, Sumner is required to produce "sufficient [favorable] evidence" which would

be admissible at trial supporting his claims of various constitutional violations.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence [on which the

nonmoving party relies] is merely colorable ... or is not significantly probative ... summary

judgment may be granted."  *Id.* at 249-250.  "A mere 'scintilla' of evidence supporting the

opposing party's position will not suffice; there must be enough of a showing that the [trier

of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106

S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577

(11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise

insufficient to create a genuine issue of material fact and, therefore, do not suffice to

oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Associates, Inc.*,

276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir.

1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting

4

evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will

preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine

6

issue of material fact. *Beard*, 548 U.S. at ---, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11ᵗʰ Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Sumner has demonstrated a genuine issue of material fact in order to preclude summary judgment with respect to his excessive force claim against defendant Rodgers in this defendant's individual capacity. However, the remaining defendants are entitled to summary judgment on Sumner's excessive force and medical treatment claims.

## II. DISCUSSION[4]

### A. Absolute Immunity

To the extent Sumner sues the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than

---

[4]The pleadings indicate that the actions which form the basis of the instant complaint occurred prior to Sumner's conviction for any charged offense and, therefore, relate to incidents which happened during his status as a pretrial detainee. The Fourteenth Amendment, rather than the Eighth Amendment, provides the appropriate standard for assessing whether conditions of confinement imposed upon/actions taken against a detainee are violative of the Constitution. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11ᵗʰ Cir. 1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11ᵗʰ Cir. 1996) (citations omitted) ("Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.... However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11ᵗʰ Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492 (1986) (For analytical purposes, there is no meaningful difference between the analysis required by the Fourteenth Amendment and that required by the Eighth Amendment.). Thus, this court will rely on cases interpreting the Eighth Amendment's prohibition against cruel and unusual punishment, and not the Fourteenth Amendment's guarantee of due process, when addressing the plaintiff's claims for relief because the standard for violations of the Eighth Amendment apply to pretrial detainees through the Due Process Clause of the Fourteenth Amendment. *Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 (11ᵗʰ Cir. 1994) (observing that "[w]hether the alleged violation is reviewed under the Eighth or Fourteenth Amendment is immaterial.").

name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  Under all facets of Alabama law, a county sheriff, his jailers and medical staff act as state officers "when supervising inmates and otherwise operating the county jails." *Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285, 1289 (11th Cir. 1998); *see* Ala. Const. Art. V, § 112 (designates sheriff as member of State's executive department); *see also Parker v. Amerson*, 519 So.2d 442 (Ala. 1987) (county sheriff is executive officer of the State).  "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state officials entitled to Eleventh Amendment immunity when sued in their official capacities.  Thus, the defendants are entitled to absolute immunity from the plaintiff's claims for monetary damages asserted against them in their official capacities.

## B.  Allegation of Excessive Force

Sumner contends that on November 14, 2005, he and defendant Rodgers engaged

in a verbal exchange as Rodgers attempted to collect clothing from the inmates in D-Pod. At this time, Sumner voiced complaints with regard to the manner in which Rodgers accomplished his duties. Sumner alleges that Rodgers then threatened him with pepper spray, handcuffed him with his hands behind his back, "slammed [him] against the wall [and] then pushed [him while] descending the stairs." *Plaintiff's Complaint - Court Doc. No. 1* at 6. Sumner maintains that he followed Rodgers' order to sit in the hallway when without provocation "officer Rodgers punched me in the right side of my head with his right hand and then ... pepper sprayed me 4-8 inches away" from my face. *Id.* Sumner asserts Rodgers then escorted him to the infirmary where he "was snatched backwards by my cuffs and grabbed by my head on both sides by officer Rodgers [and] slammed into the wall time after time." *Id.* at 6-7. Sumner contends he suffered an injury to his right eye as a result of this altercation for which the jail's medical staff denied him adequate treatment.

Defendants Rodgers and Glover deny violating the plaintiff's constitutional rights with respect to the alleged use of excessive force. Specifically, it is undisputed that defendant Glover had no personal involvement with the incident about which the plaintiff complains. Additionally, defendant Rodgers maintains he used only that amount of force necessary to control Sumner after the inmate disobeyed several orders, cursed Rodgers and acted in a physically threatening manner towards the officer. *Defendants' Exhibit 2 (Affidavit of Ellis Rodgers) - Court Doc. No. 24-3* at 2-4 (When collecting jump suits from inmates, Sumner cursed Rodgers, "the only corrections officer in the day room ... and the

plaintiff was agitated and trying to get the other ten to fifteen inmates in the day room agitated with me as well.  [After disobeying several orders to exit the day room and approach me,] the plaintiff walked up the stairs to his cell and stood there staring at me. I told the plaintiff one more time to come out of his cell and accompany me outside the POD or he would be physically removed from his cell and taken out of the POD.  The plaintiff still refused to come down stairs and come out of the POD, so when another corrections officer arrived on the scene, I went to the plaintiff's cell which was open. When I got to the plaintiff's cell, I instructed the plaintiff to turn around and put his hands behind his back.  The plaintiff complied with that instruction and I put hand cuffs on the plaintiff to walk him out of the POD....  [While in the hallway awaiting arrival of the shift commander, I ordered] the plaintiff to sit down next to the wall until my supervisor arrived.  The plaintiff refused to do so.  I told the plaintiff again to sit down in the hallway and the plaintiff refused to do so saying 'I do not have to do a f--king thing you say boy.' I told the plaintiff to sit down and if he did not do so that I would have to spray him with pepper spray.  Again the plaintiff refused and began to sway as though he was going to bull rush me.  I was about three feet from the plaintiff and it was at that point that I removed my canister of cap stun pepper spray and sprayed the plaintiff to stop him from bull rushing me.... [The plaintiff continued to disobey orders while en route to the medical unit, including an order] to stop walking and come back to the sink and again the plaintiff did not do so.  At that time, I walked to the plaintiff and took hold of the chain on the hand cuffs to stop him and take him back to decontamination to be cleaned up.  When I took

hold of the chain, the plaintiff [began] yelling at me [and] tried to bull rush me against the wall. I side stepped the plaintiff and let the plaintiff run into the wall with his own momentum. The other officer and myself held the plaintiff against the wall as he yelled profanity at us. I told him that as soon as he settled down, we could get the pepper spray off of him. The plaintiff kept yelling and struggling against us....").

## C. Excessive Force and Medical Treatment Claims Against Sheriff Glover

It is undisputed that defendant Glover did not personally participate in the use of force or denial of medical treatment about which Sumner complains. Moreover, the evidentiary materials submitted by the defendants demonstrate that the alleged unconstitutional actions did not occur pursuant to a policy enacted by defendant Glover.

The law is well settled that a defendant cannot be held liable under § 1983 based on a theory of respondeat superior or on the basis of vicarious liability. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1308 (11th Cir. 2006), *cert. denied*, ____ U.S.____, 127 S.Ct. 2428 (2007) ("Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999)."); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994); *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). "Instead, supervisors can be held personally liable when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Gray*, 458 F.3d at 1308 (citation omitted); *Jones v. Preuit & Mauldin*, 851 F.2d 1321 (11th

Cir. 1988).  Sumner does not allege that defendant Glover personally participated in the use of force or denial of medical treatment made the basis of the instant complaint.  Thus, the court must address Sumner's claims against this defendant under the causal connection prong.

Under this method of liability, "'[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.' ... [T]o be sufficient to notify the supervisor, the deprivations must not only be widespread, they also 'must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" *Gray*, 458 F.3d at 1308 (citations omitted).  Sumner presents no evidence of widespread, obvious, flagrant or rampant problems of continuing duration in the face of which Glover failed to take corrective action.  Consequently, there is nothing before the court sufficient to establish the requisite causal connection with respect to the claims lodged against defendant Glover.  The court therefore concludes that the motion for summary judgment is due to be granted as to Sumner's claims related to the excessive use of force and denial of medical treatment presented against defendant Glover in his individual capacity.

### D.  Excessive Force Claim Against Officer Rodgers.

Defendant Rodgers denies he used excessive force against Sumner and argues he is entitled to qualified immunity on this claim.  However, the law of this Circuit precludes a defense of qualified immunity in cases alleging excessive force in violation of the

12

Constitution because the use of force "maliciously and sadistically to cause harm" is clearly established to be a constitutional violation. *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002), citing *Hudson v. McMillian*, 503 U.S. 1 (1992), and *Whitley v. Albers*, 475 U.S. 312 (1986). Consequently, a qualified immunity defense is not available when a plaintiff alleges the use of excessive force and the only question for a federal district court is whether the plaintiff has alleged facts sufficient to survive a motion for summary judgment, unless the force used was *de minimis* in nature. *Skrtich*, 280 F.3d at 1302; *see also Hudson*, 503 U.S. at 9-10; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). Accordingly, this court will consider whether the plaintiff's claim that defendant Rodgers used excessive force against him, which the court must take as true for purposes of summary judgment, sets forth a violation of his constitutional rights.

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7-8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to

> whether the use of force could plausibly have been thought
> necessary, or instead evinced such wantonness with respect to
> the unjustified infliction of harm as is tantamount to a knowing
> willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct.
> 1078 (quoting *Johnson,* 481 F.2d at 1033).

*Skrtich*, 280 F.3d at 1300-1301.

Sumner contends defendant Rodgers employed force which was excessive, unprovoked and unjustified. Sumner maintains that as a result of this attack he suffered a severe injury to his right eye. Defendant Rodgers denies using excessive force against Sumner. In support of this assertion, Rodgers argues he utilized force in response to Sumner's aggressive actions and used only that amount of force necessary to control Sumner. Viewing the facts in the light most favorable to Sumner, as is required at this stage of the proceedings, the court concludes that defendant Rodgers is not entitled to qualified immunity as the plaintiff has alleged facts necessary to survive a motion for summary judgment. *Skrtich*, 280 F.3d at 1301. Thus, the motion for summary judgment with respect to the excessive force claim against defendant Rodgers in his individual capacity is due to be denied.

### D.  Medical Treatment for Eye Injury

Sumner alleges defendants Speigner, Hathaway and Laguerra acted with deliberate indifference to a serious medical need by failing to provide him proper medical treatment for the eye injury suffered in the November 14, 2005 altercation. Specifically, Sumner asserts the aforementioned defendants denied him immediate treatment for this injury,

14

refused to provide him antibiotic medication prescribed by his free-world physician and denied him proper dosages of medication to alleviate his pain.  The defendants adamantly deny these allegations and present numerous probative evidentiary materials which refute such allegations.

To prevail on a constitutional claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that those responsible for providing the treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).  Specifically, jail medical personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989).  When seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, ... the Supreme Court has ... emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment.  *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  Moreover, "whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a

16

classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (medical personnel do not violate the Constitution simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a "'sufficiently culpable state of mind.'"" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a serious risk of harm and causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists--and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2001). Thus, for Sumner to avoid summary judgment on his deliberate indifference claim, he is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

The medical records filed herein establish that after Sumner suffered his eye injury

the medical staff of the jail provided appropriate and adequate treatment for this injury in accordance with their assessment of his condition and pursuant to the instructions issued by free-world physicians to whom they referred Sumner for treatment. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-6 thru Court Doc. No. 24-11*. The undisputed evidentiary materials before the court further demonstrate that the medical staff routinely examined Sumner, thoroughly evaluated his complaints, prescribed medications, referred him to free-world physicians for treatment and provided treatment in accordance with their professional judgment and that of Sumner's free-world physicians. *Id*.; *Defendants' Exhibit 3 (Affidavit of Laura Laguerra) - Court Doc. No. 24-4 at 2-9; Defendants' Exhibit 4 (Affidavit of Darla Jane Speigner) - Court Doc. No. 24-5 at 2-9.* With respect to Sumner's claim he did not receive his prescribed medication, the medical records show that jail medical personnel provided Sumner all medications in accordance with the orders of the prescribing medical professional.

On November 14, 2005, directly after the pepper spray incident, correctional officers escorted Sumner to the medical unit of the jail for decontamination by the nursing staff. Defendant Laguerra furnished Sumner dishwashing liquid and cold water for rinsing and to ease the burning sensation caused by the spray. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7 at 50.* At this time, Laguerra observed "a rather extremely swollen [right] eye as well as a reddened area to the back of [inmate's] head & ... reddened areas on sides of neck." *Id*; *Defendants' Exhibit 3 (Affidavit*

18

*of Laura Laguerra) - Court Doc. No. 24-4* at 5-6 ("On Monday, November 14, 2005, when the plaintiff had to be sprayed with cap-stun pepper spray to subdue him, he was brought to the jail medical clinic to be decontaminated from the spray and to be evaluated and treated as ... necessary.  Due to his struggle with the officers, the plaintiff had been pepper sprayed and had reportedly rammed the wall in his attempt to ram the officers.  I examined the plaintiff and noted him to have a swollen right eye as well as a reddened area to the back of his head and on the side of his neck that was the sign of a slight struggle.  None of what I observed medically was of a serious nature.  Once we were able to get the plaintiff to settle down, we had his hand cuffs taken off and proceeded to decontaminate the plaintiff and I assisted him to wash himself with dish washing liquid [and cold water]....  The plaintiff was decontaminated according to proper medical procedure.  After the decontamination process was completed, I noted that the plaintiff's right eye was red and swollen which is not uncommon with the use of pepper spray.  After my examination of the plaintiff, I found him to be in satisfactory condition and [he] was returned to his cell.").

On November 17, 2005, a nurse, while dispensing medications to the plaintiff, observed swelling to Sumner's right eye which prompted a more thorough examination in the medical clinic.  *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7* at 19.  During this examination, Sumner "was found to have some swelling of his right eye lid that was tender to touch.  The conjunctiva of his right eye was

red and the sclera or white portion of his right eye -- more on the inner eye -- was red as well.  No drainage was noted....  At that time it was noted that the plaintiff's right temple was slightly swollen and his upper cheek area appeared to be slightly swollen with his right temple area being tender to touch.  The right temple and upper cheek swelling observed was consistent with some type of very recent trauma that day to those areas which could have impacted his right eye as well.  The plaintiff claimed that the problem related to his right eye was caused exclusively by having been sprayed with pepper spray three days earlier.  While that may have been the cause, it is also probable that the abrasion resulted from the plaintiff's rubbing of his eye or washing of his eye after [the incident with officer Rodgers].  It also could have resulted from the apparent November 17, 2005 horse play or other altercation resulting in the trauma to and swelling of his right temple and upper right cheek that was observed that day.  The plaintiff was moved into one of the medical cells in the jail medical clinic for observation and was referred to an opthamologist (sic) [at the Southeast Eye Clinic for further evaluation] the next day."  *Defendants' Exhibit 4 (Affidavit of Darla Jane Speigner) - Court Doc. No. 24-5 at 6-7; Defendants' Exhibit 3 (Affidavit of Laura Laguerra) - Court Doc. No. 24-4 at 6-7 (same).*

On his initial referral to the Southeast Eye Clinic on November 18, 2005, Dr. Whatley diagnosed Sumner with a corneal abrasion to his right eye and prescribed Tobradex, an ophthalmic drop, four times per day for treatment of the abrasion with artificial tears to each eye for rinsing five minutes thereafter.  *Defendants' Exhibit 5*

(*Inmate Medical Records of Bryan Sumner*) - *Court Doc. No. 24-8* at 47.  Upon his return

to the jail, the medical staff provided the prescribed medications to Sumner with detailed

instructions on their use and allowed Sumner to keep these medications on his person.

*Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7*

at 32.  Jail personnel transported Sumner to a follow-up appointment with Dr. Whatley on

November 21, 2005 at which time the physician continued the prescription for Tobradex

and added a prescription for Cyclopentolate, another eye drop.  *Defendants' Exhibit 5*

*(Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-8* at 46.  Again, the jail's

medical staff provided Sumner his prescribed medications.  *Defendants' Exhibit 5 (Inmate*

*Medical Records of Bryan Sumner) - Court Doc. No. 24-7* at 32.

On December 2, 2005, Sumner returned to the Southeast Eye Clinic for evaluation

by a corneal specialist, Dr. Jimmy Carter.  *Defendants' Exhibit 5 (Inmate Medical Records*

*of Bryan Sumner) - Court Doc. No. 24-8* at 44.  Dr. Carter diagnosed Sumner with

Exposure Keratopathy in his right eye and prescribed Cyclogyl, Tobradex, Systane and

Refresh Liquigel, all forms of eye drops, for treatment of the eye and advised Sumner to

tape the right eye shut at night.  *Id.*  He also scheduled Sumner for an "in office procedure

known as Total Temporary Tarsorrhaphy - stitching the eyelids together for temporary

relief of the right eye."  *Id.*  Sumner received all prescribed medications.  *Defendants'*

*Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7* at 30, 32-33.

In accordance with the physician's orders, the jail's medical staff scheduled Sumner

an appointment with Dr. Carter on December 5, 2005 for the referenced procedure. However, at this time, Dr. Carter determined "(Total) Temporary Tarsorrhaphy Right Eye was not necessary to perform today, cornea was clear [patient] to [discontinue] Cyclogyl & Tobradex - continue [with] Refresh Liquigel [drops to right eye at bedtime] & tape [right eye] @ pm." *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-8* at 42. Dr. Carter advised that Sumner should "be seen [again] in 1 wk." *Id.*

On December 12, 2005, jail personnel transported Sumner to the scheduled follow-up appointment with Dr. Carter at which time Dr. Carter performed a "Total Temporary Tarsorrhaphy [of the] Right Eye...." *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-8* at 39. Dr. Carter prescribed Bacitracin, an ophthalmic ointment, for application to Sumner's sutures twice daily. *Id.* Sumner received this prescription from the ophthalmologist and the jail medical staff allowed him to keep it on his person so that he could undertake proper application without having to seek assistance from medical personnel. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7* at 3, 33. On his return to the jail, nurse Speigner prescribed Ultram, a synthetic analgesic, for pain relief. *Id.* at 2. The following day Sumner reported to sick call complaining of an allergic reaction to Ultram and jail medical personnel therefore prescribed Toradol IM, a nonsteroidal anti-inflammatory medication, as needed for pain relief. *Id.* at 1; *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-6* at 16. In light of the inordinate amount of pain

medication sought by and provided to Sumner over the next few days, jail medical personnel on December 16, 2005 decreased the prescription for Toradol to, at most, only two doses per day as deemed needed for purposes of pain relief. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-6 at 16, 48.* Sumner received his Toradol in accordance with the prescription instructions. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7 at 31.* On December 22, 2005, nurse Speigner discontinued Sumner's prescription for Toradol. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-6 at 16, 47.*

On December 14, 2005, nurse Hathaway referred Sumner to Dr. Carter due to Sumner's complaints of "sutures falling out in [his lower] eyelid." *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-8 at 33.* Dr. Carter examined Sumner and observed "sutures are intact...." *Id.* On January 3, 2006, Dr. Cater removed the sutures from Sumner's right eye and evaluated his condition. *Id.* at 29. At this time, Dr. Cater advised Sumner his "cornea is healed" and prescribed Tobradex for application to his right eye in accordance with specified instructions and Bacitracin on his lid margins for one day with Sumner to then discontinue use of such ointment. *Id.*; *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-9 at 25; Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-7 at 35.*

On February 13, 2006, the jail's medical staff again referred Sumner to Dr. Carter

for examination regarding Sumner's complaints of pain and irritation in his right eye. *Defendants' Exhibit 5 (Inmate Medical Records of Bryan Sumner) - Court Doc. No. 24-9* at 13. Dr. Carter could not find any medical basis for the majority of Sumner's complaints as he observed only "minimal staining" of the cornea but did, however, determine Sumner suffered from dry eye syndrome. *Id*. at 13-14. Dr. Carter advised Sumner that the dry eye syndrome had "prob[ably] been present all of [his] life" and prescribed no treatment "@ this time." *Id*. at 14. Dr. Carter did prescribe eye drops for relief of the dry eye condition but refused to prescribe any pain medication. *Id*. The medical records further demonstrate that the jail's medical personnel evaluated Sumner each time he complained of eye problems, prescribed medication/treatment to Sumner, continued to refer Sumner to free-world ophthalmologists as necessary for evaluation/treatment of his eye complaints and provided Sumner all medications and other forms of treatment prescribed by these physicians.

The affidavit filed by defendant Speigner delineates the treatment provided to Sumner as follows:

> Due to his struggle with the officers [on November 14, 2005], the plaintiff had been pepper sprayed and had reportedly rammed the wall in his attempt to ram the officers. The plaintiff was noted to have a swollen right eye as well as a reddened area to the back of his head and on the side of his neck that was the sign of slight struggle. None of what was observed medically was of a serious nature. Once we were able to get the plaintiff to settle down, we had his hand cuffs taken off and proceeded to decontaminate the plaintiff by assisting him to wash himself with dish washing liquid [and cold water].... The plaintiff was decontaminated according to proper medical

24

procedure. After the decontamination process was completed, the plaintiff's right eye was noted to be red and swollen which is not uncommon with the use of pepper spray. The plaintiff was examined and found to be in satisfactory condition and was returned to his cell.

On November 17, 2005, during the course of dispensing ... daily medications to the plaintiff, one of the nurses on duty noticed that the plaintiff's right eye was somewhat swollen. The plaintiff was seen in the jail medical clinic where he was found to have some swelling of his right eye lid that was tender to touch. The conjunctiva of his right eye was red and the sclera or white portion of his right eye -- more on the inner eye -- was red as well. No drainage was noted.... At that time it was noted that the plaintiff's right temple was slightly swollen and his upper cheek area appeared to be slightly swollen with his right temple area being tender to touch. The right temple and upper cheek swelling observed was consistent with some type of very recent trauma [inflicted] that day to those areas which could have impacted his right eye as well. The plaintiff claimed that the problem related to his right eye was caused exclusively by having been sprayed with pepper spray three days earlier. While that may have been the cause, it is also probable that the abrasion resulted from the plaintiff's rubbing of his eye or washing of his eye after he was returned to his cell. It also could have resulted from the apparent November 17, 2005 horse play or other altercation resulting in the trauma to and swelling of his right temple and upper right cheek that was observed that day. The plaintiff was moved into one of the medical cells in the jail medical clinic for observation and was referred to an opthamologist (sic) for treatment the next day.

On November 18, 2005, the plaintiff was seen by a doctor at the Southeast Eye Clinic and found to have a corneal abrasion for which an antibiotic drop and artificial tears and eye patch were prescribed and instructions for their use were provided to the plaintiff by the doctor. The prescriptions were obtained for the plaintiff and the instructions were again given to the plaintiff by the jail medical staff when the plaintiff was seen in the jail medical clinic upon his return from the doctor's office. The plaintiff was scheduled for a follow up appointment with the doctor [at the Southeast Eye Clinic] on November 21, 2005.

The plaintiff was seen again by the doctor at the Southeast Eye Clinic on November 21, 2005, and returned to the jail with a prescription for another eye drop which was obtained for the plaintiff. The plaintiff was again seen in the jail medical clinic upon his return from the doctor's office and was again instructed with regard to the use of the eye drops prescribed. On November 22, 2005, the plaintiff was seen in the jail medical clinic

for follow up after his doctor's visit and to have his blood pressure checked.

>In the days that followed, the plaintiff was observed repeatedly not wearing his eye patch as prescribed and was observed engaging in horseplay with other inmates without wearing his eye patch.  The staff of the jail were unable to get the plaintiff to comply with the treatment prescribed [by the eye physician] for the corneal abrasion in his right eye.  When the eye would become painful, then the plaintiff would complain of the pain.  As a result of the failure of the plaintiff to comply with the doctor's orders and the orders of the jail medical staff, the eye doctor suggested sewing the plaintiff's eye lid shut to allow the cornea to heal.  This procedure was scheduled [with a corneal specialist] and carried out.  All in all the plaintiff was seen by the doctors of the Southeast Eye Clinic eight different times for treatment of his corneal abrasion....
>
>\*\*\*
>
>In addition to seeing the eye doctor eight times, ... the plaintiff was seen numerous times by the medical personnel or doctor in the jail medical clinic [for evaluation and treatment of his eye injury].

*Defendant's Exhibit 4 (Affidavit of Darla Jane Speigner) - Court Doc. No. 24-5* at 6-8;

*Defendant's Exhibit 3 (Affidavit of Laura Laguerra) - Court Doc. No. 24-4* at 6-8 (same).

A thorough and comprehensive review of the plaintiff's medical records supports the assertions contained in the medical defendants' affidavits.

Under the circumstances of this case, it is clear that the course of treatment undertaken by the medical defendants was neither grossly incompetent nor inadequate.  It is undisputed that Sumner received continuous and necessary medical treatment for his eye injury in accordance with the professional judgment of the jail medical staff and his free-world physicians.  His assertions regarding a mere desire for different modes of medical treatment and/or the challenges to the chosen course of treatment do not, under the facts of this case, amount to deliberate indifference.  *Harris*, 941 F.2d at 1505; *Hamm*, 774 F.2d

at 1575; *Garvin*, 236 F.3d at 898; *Franklin*, 662 F.2d at 1344.  Sumner has failed to present any evidence which indicates the medical defendants knew that the manner in which they treated his injured eye created a substantial risk to the plaintiff's health and that with this knowledge consciously disregarded such risk.  Thus, the record is devoid of evidence, significantly probative or otherwise, showing that defendants Speigner, Hathaway or Leguerra acted with deliberate indifference to Sumner's eye injury.  Summary judgment is therefore due to be granted in favor of these defendants on this claim.

### III.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motion for summary judgment regarding the plaintiff's claims for monetary damages against the defendants in their official capacities be GRANTED as the defendants are entitled to absolute immunity from these claims.

2.  The motion for summary judgment filed on behalf of defendant Lamar Glover with respect to the plaintiff's excessive force and medical treatment claims presented against this defendant in his individual capacity be GRANTED.

3.  The motion for summary judgment be GRANTED in favor of defendants Darla Speigner, Valerie Hathaway and Laura Laguerra as to the plaintiff's claim of inadequate medical treatment lodged against them in their individual capacities.

4.  The motion for summary judgment regarding the plaintiff's excessive force claim against defendant Ellis Rodgers in his individual capacity be DENIED.

5.  The plaintiff's excessive force claim against defendant Ellis Rodgers in his individual capacity be set for a jury trial.

It is further

ORDERED that on or before June 30, 2008 the parties may file objections to the Recommendation.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 20th day of June, 2008.

_____/s/ Wallace Capel. Jr._____
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE